Law Offices of Steve Newman
Steve Newman (SN 8351)
65 Broadway, Suite 1603
New York, NY 10006
Telephone: 212-405-1000

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAUNDA PHILLIP, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No.: 1:21-CV-06599-MKB-PK |
| ) | |
| CITY OF NEW YORK, a municipal corporation, ) | |
| NYPD OFFICER "JOHN DOE" ROBINSON, ) | |
| in his individual and official capacity, ) | |
| NYC HEALTH AND HOSPITALS ) | |
| CORPORATION, a public benefit corporation, ) | |
| NYC HEALTH AND HOSPITALS ) | |
| CORPORATION/WOODHULL MEDICAL ) | |
| CENTER, a public benefit corporation, ) | |
| HTET HTET LINN, M.D. in her individual and ) | |
| official capacity, and ) | |
| KIRK PATTERSON, M.D., in his ) | |
| individual and official capacity, ) | |
| ) | |
| Defendants. ) | |

**AMENDED COMPLAINT FOR MONEY DAMAGES AND JURY DEMAND**

Plaintiff SHAUNDA PHILLIP (hereinafter referred to as "plaintiff"), by her attorney

Law Offices of Steve Newman, alleges, upon personal knowledge as to herself and upon

information and belief as to other matters, as follows:

**INTRODUCTION**

1. This is a civil rights action brought pursuant to 42 U.S.C. §1983 in which plaintiff

seeks compensatory and punitive damages against the individual defendants in their

individual and official capacities and compensatory and punitive damages against the

municipal defendants and public benefit corporation defendants for violation of

1

plaintiff´s rights guaranteed plaintiff under the 4th, and 14th Amendments to the United States Constitution and Article I §12 of the Constitution of the State of New York.

### JURISDICTION AND VENUE

2.  This court has original jurisdiction over plaintiff's claims pursuant to 42 U.S.C. §1983. The court has jurisdiction over State Law Claims pursuant to 28 U.S.C. §1367.

3.  Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b) because the claims arose in this district and plaintiff resides within this district.

4.  An award of costs and attorney's fees are authorized pursuant to 42 U.S.C. §1988.

### ALLEGATIONS OF LAW

5.  Each and every act of defendants was committed under color of state law.

6.  Defendants' actions have chilled and deprived plaintiff in the exercise of her rights and guarantees provided under the United States Constitution and the New York State Constitution.

7.  The Acts of defendant New York City Police Department ("NYPD") officer "JOHN DOE" ROBINSON hereby defined as "Robinson" were done pursuant to official policies, directives or other acts of the municipal corporation, and the NYPD which caused in whole or in part the deprivation of plaintiff's rights alleged herein.

8.  The acts of Robinson alleged herein were done pursuant to the orders of other NYPD´s officers who were in the position of establishing authoritative and binding orders, policy and custom for the City of New York, and NYPD, which caused in whole or in part the deprivation of plaintiff´s constitutional rights.

### THE PARTIES

9.  Plaintiff is a resident of Kings County.

10. Defendant CITY OF NEW YORK ("City") is a municipal corporation organized under the laws of the State of New York.

11. Defendant ROBINSON is employed as a police officer with the NYPD. This action is against Robinson in his individual and official capacity.

12. Defendant TERENCE MONAHAN ("Monahan") was the Chief of Police for the City of New York. Monahan was responsible for the hiring, training and monitoring of the City of New York police officers. This action is against Monahan in his official capacity.

13. Defendant NYC HEALTH AND HOSPITALS CORPORATION ("NYCHH") is a non-mayoral agency located in New York, New York.

14. Defendant NYC HEALTH AND HOSPITALS CORPORATION/WOODHULL MEDICAL CENTER ("Woodhull") is a non-mayoral agency located in New York, New York.

15. Defendant HTET HTET LINN, M.D. ("Linn") is a psychiatrist employed by Woodhull. This action is against Linn in her individual and official capacity.

16. Defendant KIRK PATTERSON, M.D. ("Patterson") is a psychiatrist employed by Woodhull. This action is against Patterson in his individual and official capacity.

## FACTUAL ALLEGATIONS

17. July 2, 2020 plaintiff's mother Darlen Usher ("Usher") called 911 requesting City personnel visit her daughter, plaintiff's apartment based on Usher´s informing the 911 operator plaintiff was experiencing hallucinations and was noncompliant in ingesting prescribed medications during the previous eight months.

18. July 2, 2020 individuals employed by the NYPD including defendant Robinson and individuals employed by City Emergency Medical Services ("EMS") arrived at plaintiff´s residence, 620 Gates Avenue, Apt. 6A Brooklyn, NY.

19. NYPD officers including defendant Robinson stationed themselves in front of plaintiff's apartment door.

20. EMS personnel stationed themselves in front of plaintiff's apartment door.

21. An individual knocking on plaintiff's door identified himself as a City EMS employee.

22. The EMS employee requested plaintiff open her apartment door.

23. Plaintiff did not open her apartment door refusing to do so.

24. Plaintiff inquired as to the reason EMS employees were massed in front of her apartment door noting she, plaintiff did not request City EMS assistance.

25. The individual identifying himself as an EMS employee informed plaintiff, plaintiff's mother called 911 requesting EMS personnel check on plaintiff's wellbeing.

26. Plaintiff called Usher, her mother, inquiring if her mother called EMS requesting EMS personnel visit plaintiff's apartment to check on her welfare.

27. Usher informed plaintiff, she, Usher did call City EMS.

28. Plaintiff informed the person who identified himself as an EMS personnel, she, plaintiff was feeling well, such that she did not require EMS assistance informing the EMS personnel the EMS personnel could leave.

29. The NYPD and EMS personnel standing outside of plaintiff's apartment door consisted of five individuals.

30. Plaintiff repeatedly refused to open her apartment door despite the NYPD and EMS personnel requesting plaintiff open her apartment door.

31. One of the individuals standing outside of plaintiff's apartment door inquired as to plaintiff's first name.

32. Plaintiff responded, inquiring why do you need my first name if my mother called requesting you inquire about my wellbeing by visiting my apartment.

33. Plaintiff requested the NYPD and EMS personnel leave her apartment building.

34. One of the NYPD and/or EMS personnel informed plaintiff said personnel would not leave noting he wanted to talk to plaintiff.

35. Additional statements made by one of the NYPD and/or EMS personnel repeatedly requested plaintiff hold her hands up so that her hands could be viewed through the apartment door peephole.

36. Plaintiff responded to the NYPD or EMS inquiries by stating she was feeling fine and was safe.

37. One of the NYPD and/or EMS personnel informed plaintiff that the individuals standing outside of her apartment door would not leave until they were able to determine plaintiff´s wellbeing.

38. Plaintiff refused to open her apartment door.

39. One of the NYPD and/or EMS personnel screamed and banged his fists on plaintiff´s door demanding plaintiff open her apartment door.

40. NYPD and/or EMS personnel knocked on plaintiff´s apartment door for approximately twenty minutes informing plaintiff the NYPD and EMS personnel were going to enter plaintiff´s apartment.

41. A NYPD officer cut a hole in plaintiff´s apartment door using a mechanical device to do so.

42. The hole cut in plaintiff´s apartment door was cut in a shape of a triangle.

43. One of the NYPD and/or EMS personnel placed a small surveillance robot through the hole cut in plaintiff´s apartment door.

44. The surveillance robot was utilized in an attempt to observe plaintiff.

45. Plaintiff, observing the surveillance robot inquired as to what was the nature of this mechanical device inserted through plaintiff´s apartment door.

46. NYPD and EMS personnel informed plaintiff the surveillance robot had been placed in plaintiff's apartment so NYPD and EMS personnel could observe plaintiff's hands.

47. Plaintiff told NYPD and EMS personnel to go away.

48. Plaintiff, reacting to surveillance robot in her apartment put the surveillance robot in a bucket, subsequently putting the bucket containing the surveillance robot in a closet.

49. NYPD and/or EMS personnel requested plaintiff return the surveillance robot, plaintiff refused.

50. One of the NYPD and/or EMS personnel inserted a second surveillance robot through the hole cut in plaintiff's apartment door.

51. Plaintiff, reacting, observing the second surveillance robot and placed the second surveillance robot into a bucket.

52. Plaintiff used a hammer, repeatedly hitting the interior of her apartment door in an effort to flatten metal peeled back so that she could not be observed.

53. Plaintiff informed NYPD and/or EMS personnel that the cutting of hole in her apartment door would result in plaintiff getting into trouble with the apartment super and management because she would be held responsible for the apartment door being damaged.

54. Plaintiff recorded her interactions involving NYPD and/or EMS personnel on an iPad.

55. NYPD and/or EMS personnel continued for one hour calling plaintiff's name requesting plaintiff open her apartment door

56. Plaintiff mopped her floor ignoring NYPD´s and/or EMS´ personnel´s requests.

57. NYPD and/or EMS personnel broke plaintiff´s apartment door lock entering en mass plaintiff's apartment.

58. NYPD and/or EMS personnel entering plaintiff's apartment did not possess a court-ordered search warrant.

59. NYPD and/or EMS personnel entering plaintiff's apartment observed plaintiff sitting in a chair..

60. A number of NYPD personnel entering plaintiff's apartment possessed firearms, bulletproof vests, and helmets.

61. Plaintiff docile, did not physically react to the NYPD and/or EMS personnel during the interim they entered her apartment, plaintiff continuing to sit in a chair.

62. Plaintiff, sitting in a chair had her hands pulled to her back permitting her hands to be handcuffed.

63. Plaintiff, sitting in a chair, handcuffed, did not speak.

64. Plaintiff was lifted out of a chair by NYPD and/or EMS personnel who had entered plaintiff's apartment.

65. Plaintiff's arms were held by NYPD and/or EMS personnel.

66.  Plaintiff to the NYPD and/or EMS personnel without a warrant "this is not right".

67. Plaintiff was informed by NYPD and/or EMS personnel who entered her apartment she was being transported downstairs so her vitals could be checked.

68. Plaintiff responded by declaring she did not have to be handcuffed in order to have her vitals checked downstairs.

69. One of the NYPD and/or EMS personnel who entered the apartment informed plaintiff she was handcuffed to ensure NYPD and/or EMS personnel safety as well as plaintiff's safety.

70. Plaintiff asked the NYPD and/or EMS personnel who entered her apartment whether she could procure her wallet and house keys located in her bedroom.

71. Plaintiff was informed NYPD and/or EMS personnel would retrieve her wallet and house keys.

72. Plaintiff inquired how would NYPD and/or EMS personnel know where her wallet and house keys are located.

73. Plaintiff informed the individuals that she could not leave her apartment without her apartment being locked.

74. Plaintiff informed the NYPD and/or EMS personnel she, plaintiff was afraid that an individual would break into her apartment in that her apartment door was unlocked.

75. Plaintiff was informed by one of the NYPD and/or EMS personnel she would be free to return to her apartment once it was determined her vital measurements were normal.

76. Plaintiff requested to be escorted to her bedroom to retrieve her wallet and identification.

77. Plaintiff's request was refused.

78. Plaintiff was escorted to an elevator by NYPD and/or EMS personnel holding her arms.

79. EMS personnel conducted a vitals measurement check in an EMS ambulance parked in front of plaintiff's apartment.

80. Two NYPD vehicles were parked in the vicinity of the EMS ambulance during the time the EMS personnel was conducting vitals check.

81. A crowd of fifteen to twenty individuals gathered in the location of the EMS ambulance during the time EMS personnel conducted a wellness check.

82. Plaintiff's wrists were handcuffed behind her back during the time her vitals were checked.

83. A nurse questioning plaintiff in the EMS ambulance inquiring whether plaintiff was prescribed any medications, whether plaintiff suffered from any major health issues, and requesting plaintiff recite her medical history.

84. An EMS employee observed plaintiff while a female employee questioned plaintiff.

85. Plaintiff was transported in the EMS ambulance to Woodhull.

86. The transport of plaintiff to Woodhull taking approximately thirty minutes.

87. Plaintiff arrived at the hospital at approximately 3:30 p.m.

88. Plaintiff was escorted by NYPD officers into an area where plaintiff underwent the admittance process.

89. Conversation ensued, such that plaintiff was made aware the last name of one of the NYPD police officers who accompanied her from her apartment to Woodhull was Robinson.

90. NYPD officer Robinson having the same name as plaintiff's boyfriend.

91. Plaintiff informed Woodhull personnel and NYPD and EMS personnel she did not wish to be admitted to Woodhull requesting she be permitted to return to her apartment.

92. Plaintiff, initially resisting providing any personal information decided it would be efficacious to provide information.

93. Plaintiff was informed she was being admitted to Woodhull.

94. Plaintiff was informed her vitals were normal.

95. Plaintiff informed Woodhull personnel she did not wish to be medicated.

96. Plaintiff informed Woodhull personnel she did not want to be admitted to Woodhull.

97. Woodhull personnel medicated plaintiff despite plaintiff's objections.

98. Plaintiff requested she be permitted to document the fact she was refusing to be medicated.

99. Plaintiff, subsequent to being medicated informed Woodhull personnel she wanted to file a complaint documenting the fact her civil rights were being violated.

100.     Plaintiff was informed by Woodhull personnel she would have to wait until a supervisor arrived before she, plaintiff could file a complaint.

101.     Plaintiff requested the names of the Woodhull personnel who were involved in medicating plaintiff.

102.     Woodhull personnel informed plaintiff she would have to wait until a supervisor arrived so that she could be informed as to the Woodhull personnel who injected her with medication.

103.     Plaintiff requested she be permitted to make a telephone call.

104.     Plaintiff was not permitted to use a telephone until the following day.

105.     Plaintiff was medicated second time the day she was admitted to Woodhull.

106.     Plaintiff, refusing to be subjected to the injection of the medication was restrained by two Woodhull employees.

107.      Plaintiff waking up three hours subsequent to being medicated queried when she would be discharged.

108.     Plaintiff was informed that she would have to take a COVID test.

109.     Plaintiff was informed, subsequent to the results being obtained, plaintiff would be examined by a physician.

110.     Plaintiff was not examined by a physician.

111.     Plaintiff, waiting to be examined by a physician requested she, plaintiff be permitted to speak to a supervisor.

112.     Plaintiff requested a copy of patient´s Bill of Rights.

113.     Plaintiff requested to use a telephone.

114.     Plaintiff called a hotline number informing the individual who answered the hotline number that she, plaintiff wanted to report an assault and file a complaint

against Woodhull complaining she was medicated against her will and not provided with a patient´s Bill of Rights.

115.     Plaintiff was informed her COVID test result was negative.

116.     Plaintiff was informed that a physician would determine if she would be released in three or four days.

117.     Plaintiff, during the four days she was held in Woodhull hospital was never examined by a physician.

118.     During the four days plaintiff was held in Woodhull plaintiff refused medication.

119.     The second night plaintiff was held in the Woodhull hospital room plaintiff was forcibly injected with medication.

120.     Plaintiff was held against her will at Woodhull.

121.     Plaintiff, four days after being held against her will at Woodhull spoke to her mother.

122.     Plaintiff requested her mother obtain information from a Woodhull physician so that plaintiff could be released from Woodhull.

123.     Plaintiff informed her mother, she, plaintiff filed a complaint regarding being forced to take medication.

124.     Plaintiff´s mother informed plaintiff, she, plaintiff´s mother called EMS so as to have EMS personnel check on plaintiff´s wellbeing.

125.     Plaintiff´s mother informed plaintiff during a telephone conversation that she, plaintiff´s mother was going to visit Woodhull and provide plaintiff with clothes.

126.     Plaintiff informed her mother she, plaintiff wanted to be released from Woodhull.

11

127.     Plaintiff was released August 10, 2020 having been held against her will at Woodhull for thirty nine (39) days.

128.     July 2, 2020 Woodhull personnel notated information on form OMH 474 (10-08), EMERGENCY ADMISSION §939 Mental Hygiene Law (MHL) relating to Shaunda Phillip.

129.     The following notations were written on form OMH 474-(10-08). "II… Record of Admission A. the above-named person was brought to this hospital by:" was left incomplete.

130.     "Title-Badge No. (as appropriate)" was left incomplete.

131.     "Relationship to person" was left incomplete.

132.     "B. Circumstances which led to this person being brought to this hospital:" is partially legible.

133.     A handwritten note sets forth the following.

134.     Plaintiff's history of thirty eight (38) years…African-American female…schizophrenic, brought in by EMS for non-compliance…auditory hallucinations…

135.     The form OMH 474 II. B sets forth the following. (If applicable) Person was taken into custody transported or removed to this hospital in accordance with MHL Sect._____. The MHL section was left incomplete.

136.     The form OMH 474 C sets forth the following. I HAVE EXAMINED THE ABOVE-NAMED PERSON PRIOR TO ADMISSION AND FIND THERE IS REASONABLE CAUSE TO BELIEVE THE PERSON HAS A MENTAL ILLNESS FOR WHICH IMMEDIATE OBSERVATION, CARE AND TREATMENT IN A MENTAL HOSPITAL IS APPROPRIATE AND WHICH IS LIKELY TO RESULT IN A SERIOUS HARM TO HIMSELF OR HERSELF OR OTHERS.

137.     Form OMH 474, Physician´s signature line denotes a stamp, HTET HTET
         LINN, M.D. ATTENDING PHYSICIAN PSYCH…Lic. # 262390…

138.     Form OMH 474 denotes plaintiff was admitted to Woodhull July 2, 2020 at
         3:30 p.m.

139.     Form OMH 474 page 2, III. Examination to confirm need for extension of
         emergency admission beyond 48 hours A. pertinent and significant factors in patient´s
         medical and psychiatric history:" sets forth the following "Schizoattention disorder.

140.     Form OMH 474 C. Mental Condition: the conduct of the patient including
         statements made by others has been:…, grandiosity.

141.     Form OMH 474 B. the patient shows the following psychiatric signs and
         symptoms….

142.     Form OMH 474 E. does the patient show a tendency for serious harm for
         him/herself?

143.     The box denoting "Yes" was checked.

144.     Form OMH 474 E. does the patient show a tendency for serious harm to
         others?

145.     The box denoting "Yes" was checked.

146.     Form OMH 474 E… sets forth the following If yes, explain:.

147.     The handwritten language following the phrase If yes, explain, denotes danger
         to herself & other.

148.     Form OMH 474 F. Mental Diagnosis (If determined): sets forth the following,
         Schizoaffective Disorder.

149.     Form OMH 474 IV. Psychiatrist´s Confirmation I have personally observed
         and examined Phillip Shaunda on July 3, 2020 12 o´clock p.m..

150.     Form OMH 474 "IV. Psychiatrist Confirmation set forth the following.

151.    Based on such examination and the case history I hereby confirm that there is reasonable cause to believe that the patient has a mental illness for with [sic] immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others. The facts stated on information obtained herein are true to the best of my knowledge and belief. I am on the psychiatric staff of Woodhull Hospital.

152.    Form OMH 474, Physician´s signature line denotes a stamp, "KIRK PATTERSON, M.D. ATTENDING PHYSICIAN PSYCH…Lic. # 212317,…"

153.    PES physician note by Dianna Haughtun-Bennett, NP at 07-02-20 1530 (continued) Psychiatric Evalution sets forth the following, hallucinations, PT wasn´t compliant with medications for 8 months, mother called 911 to go to the daughter´s houe [sic].

154.    Woodhull´s Psychiatric Emergency Services Assessment History of Present Illness sets forth the following.

155.    Phillip Shaunda is a 38 y-o AAF with PPHX of psychotic disorder BIB EMS, escorted by the police, activated by mother for psychiatric evaluation, secondary to hallucination non-compliant with medication for 8 months. Upon arrival, patient presentation were hyper talkative, manic, grandiosity delusional, labile, flight of ideas, illogical, vociferous, agitated due to acute psychosis, disorganized in thought process, paranoid, odd/bizarre, absent insight of her mental illness. She was medicated with Haldol 5 mg Ativan 2 mg IM STAT for psychotic/manic agitation due to acute psychosis one agent would have likely been ineffective to manage grossly psychotic behavior. Less invasive measure like staff support offer help did not work to deescalate and declined oral medication.

156.    The heading History of present illness set forth the following, she denies, suicidal/homicdal [sic] ideation, perceptual disturbances, alcohol and drug uses, patient has a history of marijuana.

157.    The heading History of present illness set forth the following. Writer who called mother for patient´s permission, Darlen Usher,…who reported that patient is unemployed and Darlen Usher activated 911 to check on her daughter´s wellbeing d/t being paranoid Darlen Usher stated that patient believes people are entering her apartment and the neighbors are utilizing her tablet.

158.    The heading History of present illness set forth the following, suicidal Risk Assessment: Patient denies her suicidal or homicidal ideations. Current SSR score shows no risk for suicide. Plan is to monitor see SSR score and to continue medications and observe closely [q 15 minutes] for suicide thoughts or behavior if any are expressed or observed.

159.    The heading History of present illness set forth the following. "Violence Assessment: Patient was agitated. Broset score was above two. Plan is to monitor Broset score and to continue medication and observe closely [q 15 minutes] for aggressive behavior if any are expressed or observed."

160.    The heading History of Present Illness set forth the following, patient is psychotic/disorganized/ and imminent danger to self and will benefit from inpatient admission or medication stabilization. Case and disposition discussed with Attending LINN.

161.    Form OMH 474 (10-08) EMERGENCY ADMISSION §9.39 Mental Hygiene Law dated July 2, 2020 relating to plaintiff, I. General Provision for Emergency Admissions C. set forth the following.

162.     Within 15 days of admission it is determined that the person is not in need of involuntary care and treatment, s/he shall be discharged unless s/he is suitable and agrees to remain as a voluntary patient if the person is in need of continued in patient care treatment, and is not suitable or will not agree to remain as a voluntary patient, s/he may be retained beyond fifteen days only by completion of an application and two medical examinations as required for admission according to MHL §9.27-Involuntary Admission on Medical Certification.

163.     As of July 18, 2020 plaintiff was not suitable and did not agree to remain as a voluntary patient at Woodhull.

164.     No application was completed in compliance with MHL §9.27.

165.     Plaintiff was involuntarily held at Woodhull until August 10, 2020.

**COUNT 1 – CITY OF NEW YORK – 42 U.S.C. §1983, 4th AMENDMENT**

166.     Plaintiff incorporates by reference paragraphs 1 through 165 of the Complaint.

167.     Defendant Robinson forcibly broke into plaintiff´s home without a warrant and without the consent of plaintiff.

168.     Defendant Robinson, by his acts violated plaintiff´s right against unreasonable searches and seizures under the 4th Amendment of the U.S. Constitution.

169.     Defendant Robinson was acting under color of state law.

170.     Defendant Robinson knew, or a reasonable officer acting in defendant Robinson´s position would have known that his actions violated the U.S. Constitution.

171.     Plaintiff´s mother on July 2, 2020 called 911 informing the 911 operator plaintiff was hallucinating and was noncompliant in ingesting prescribed medication during the previous eight months.

172.    Plaintiff's mother limiting the information she provided to the 911 operator to her allegations plaintiff was experiencing hallucinations and was noncompliant in ingesting her prescribed medications did not convey or infer plaintiff required emergency assistance because her daughter was injured or needed to be prevented from injuring herself or others.

173.    Defendant Robinson responding to the information conveyed by plaintiff's mother had no basis to reasonably believe it was necessary to render emergency assistance to plaintiff that would justify the constitutional legal requirement that a search warrant be obtained by court order prior to entering plaintiff's apartment.

174.    NYPD officers observed and spoke with plaintiff for approximately 45 minutes, during that time the NYPD officers were unable to observe any behavior on plaintiff's part that would have required emergency assistance.

175.    An iPad video recording made by plaintiff evidences the fact at no time did plaintiff engaged in behavior that could endanger her safety, or show that plaintiff was injured such that the NYPD officers had a reasonable basis to enter plaintiff's apartment without a warrant to render emergency assistance.

176.    The facts at the time the NYPD officers observed and spoke with plaintiff could not lead a reasonable, experienced police officer to believe that there was an urgent need to render aid to plaintiff or to take action such as entering plaintiff's apartment, without a warrant, handcuffing plaintiff, and transporting plaintiff to Woodhull Hospital.

177.    "Aided Report" issued by NYPD regarding plaintiff's behavior sets forth the following. "Actions of EDP: The relevant categories assessing plaintiff when she was observed in her apartment as to whether she exhibited behavior likely to cause serious harm to herself or to others are as follows. "Attem. Physical harm to self: No.",

"Attem. Physical harm to others: No." "Placed self in dangerous situation: No." "Physically threatened others: No." "Verbally threatened others: No" "Spoke of harming self or others: No." "Unable to care for self: Yes.".

178.      The checking of the box in the  NYPD "Aided Report" "unable to care for self does not meet the legal standard pursuant to §9.39 of the MHL defining behavior likely to result in serious harm to plaintiff or others.

179.      Defendant Robinson´s invasion of plaintiff´s privacy caused plaintiff to suffer extreme emotional distress and humiliation and monetary damages.

WHEREFORE, plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest, exemplary damages and attorney fees.


## COUNT 2 – CITY OF NEW YORK – MUNICIPAL LIABILITY

180.      Plaintiffs incorporate by reference paragraphs 1 through 179 of the Complaint.

181.      Defendant City of New York developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of persons in Kings County, which caused the violation of plaintiff's rights.

182.       This policy and the custom includes, but is not limited to the following:

a. It was the policy and/or the custom of City of New York to inadequately train and supervise their police officers, including Defendant Robinson thereby failing to adequately discourage further constitutional violations on the part of their police officers.

b. The City of New York did not require appropriate in-service training or retraining of officers who were known to have engaged in police misconduct regarding violations of New York State Mental Health Law §9.39 et seq.  and the 4th and 14th Amendments of the U.S. Constitution.

18

c. As a result of the above-described policies and customs, police officers of City of New York including the Defendant Robinson, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

d. The above policies and customs demonstrated a deliberate indifference on the part of City of New York to the constitutional rights of persons within Kings County and were the cause of plaintiff's rights alleged herein being violated.

181.    Evidencing the fact that the NYPD officers were not properly trained is evidenced by the fact that the police officers observing and speaking with plaintiff for a lengthy period of time saw no behavior justifying their warrantless entry into plaintiff's apartment.

182.    If the NYPD officers were properly trained the NYPD officers would have recognized that plaintiff would have had to exhibit behavior justifying the invoking of the Emergency Aid Doctrine.

183.    The 911 call made by plaintiff's mother sole allegation regarding plaintiff's behavior alleged plaintiff was not compliant in ingesting prescribed medicine for eight months.

184.    If the NYPD officers had been properly trained they would have concluded that noncompliance in ingesting prescribed medicine did not constitute behavior that could cause serious harm to plaintiff or others or require the intervention of NYPD officers to prevent plaintiff from injuring herself.

183.    Defendant City of New York's deliberate indifference to plaintiff's constitutional rights caused plaintiff's monetary damages, pain, suffering and humiliation.

WHEREFORE, plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.

## COUNT 3– NYCHH - 42 U.S.C. §1983, 14th AMENDMENT

184.     Plaintiff incorporates by reference paragraphs 1 through 183 of the Complaint.

185.     14th Amendment of the Constitution sets forth the following. …No state….shall deprive any person of life, liberty, or property, without due process of law;…

186.     Defendant NYCHH failed to comply with Section §9.39 of the Mental Hygiene Law in that Form OMH 474 (10-08) EMERGENCY ADMISSION §9.39 Mental Hygiene Law, II. Record of Admission B. Circumstances which led to the person brought to the hospital, fails to denote any circumstances, specific facts regarding the actions taking on behalf of plaintiff that would have justified plaintiff being involuntarily hold by NYCHH because plaintiff´s actions were likely to result in serious harm to herself or others.

187.     Defendant NYCHH knew or should have known that its actions violated plaintiff´s 14th Amendment due process rights.

188.     Plaintiff was deprived of liberty without due process of law in violation of the fourteenth amendment of the U.S. Constitution.

189.     Defendant NYCHH was acting under color of state law.

190.     Defendant Htet Htet Linn, MD, the admitting psychiatrist´s failure to conduct a psychiatric examination of plaintiff July 2, 2020 is evidenced by the fact that Woodhull´s medical records fails to denote that defendant Htet Htet Linn, MD failed to conduct a psychiatric examination of plaintiff July 2, 2020.

191.     In contravention of MHL §9.39 defendant Patterson the second psychiatrist who allegedly conducted a psychiatric examination and evaluation of plaintiff failed

to explain how plaintiff exhibited a tendency to cause a serious harm to herself or others.

192.     This failure to explain how plaintiff showed a tendency to cause serious harm to herself or others is evidenced by the fact that Woodhull Hospital form OMH 474 (10-08) titled Emergency Admission §9.39 Mental Hygiene Law does not denote any basis on the part of defendant Patterson as to why he concluded plaintiff needed to be admitted involuntarily because she, by her behavior could cause harm to herself or others.

193.     Emergency Admission §9.39 of MHL requires within fifteen days of arrival at the hospital the person subject to an involuntary admission must be examined by two staff psychiatrists providing a medical basis for continuing to confine the patient to the hospital involuntarily.

194.     In contravention of Emergency Admission §9.39 of MHL plaintiff´s medical records evidence the fact that Dr. Emmanuelle Duterte as the second psychiatrist allegedly examining plaintiff failed to examine plaintiff on July 15, 2020.

195.     Rather plaintiff´s medical records, i.e. progress notes dated July 15, 2020, 3:14 p.m. were drafted by a case worker Marie E. Joseph.

196.     Dr. Emmanuelle Duterte while executing a certification that he examined plaintiff July 15, 2020 is not confirmed by any notations in plaintiff´s medical records regarding the alleged psychiatric evaluation of plaintiff on July 15, 2020.

197.     "Aided Report" issued by NYPD regarding plaintiff´s behavior sets forth the following. "Actions of EDP: The relevant categories assessing plaintiff when she was observed in her apartment as to whether she exhibited behavior likely to cause serious harm to herself or to others are as follows. "Attem. Physical harm to self: No.", "Attem. Physical harm to others: No." "Placed self in dangerous situation: No."

"Physically threatened others: No." "Verbally threatened others: No" "Spoke of harming self or others: No." "Unable to care for self: Yes.".

198.      The checking of the box in the NYPD "Aided Report" "unable to care for self does not meet the legal standard pursuant to §9.39 of the MHL defining behavior likely to result in serious harm to plaintiff or others.

    WHEREFORE, Plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.

## COUNT 4 – NYCHH - 42 U.S.C. §1983, 14th AMENDMENT

199.      Plaintiff incorporates by reference paragraphs 1 through 198 of the Complaint.

200.      Defendant NYCHH failed to comply with Section §9.39 (2)(a) of the Mental Hygiene Law in that Form OMH 474 (10-08) EMERGENCY ADMISSION §9.39 (2)(a) Mental Hygiene Law, III. Examination to confirm need for extension of emergency admission beyond forty eight (48) hours E. Does the patient show the tendency to cause serious harm to him/herself or others answering yes failed to explain the determination plaintiff showed the tendency to cause a serious harm to herself or others by denoting danger to self & others, NYCHH personnel answering yes, failed to provide an explanation as to plaintiff showing a tendency to cause serious harm to herself or others.

201.      NYCHH personnel denoted plaintiff showed a tendency to cause a serious harm to herself or others by writing danger to herself & others.

202.      Defendant NYCHH knew or should have known that its´ employees actions violated plaintiff's rights protected by the New York Mental Hygiene Law §9.39 (2)(a).

203.      Plaintiff was deprived of her civil rights in violation of the New York Mental Hygiene Law §9.39 (2)(a).

204.     Defendant NYCHH was acting under color of state law.

WHEREFORE, Plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.


## COUNT 5 –NYCHH - 42 U.S.C. §1983, 14th AMENDMENT

205.     Plaintiff incorporates by reference paragraphs 1 through 204 of the Complaint.

206.     Defendant NYCHH failed to comply with Section §9.39 of the Mental Hygiene Law in that Form OMH 474 (10-08) EMERGENCY ADMISSION §9.39 Mental Hygiene Law was violated, application was not completed as required if as in the case of plaintiff, plaintiff was retained beyond fifteen (15) days.

207.     Defendant NYCHH knew or should have known that its´ employees actions violated plaintiff's rights protected by the New York Mental Hygiene Law §9.39.

208.     Plaintiff was deprived of rights in violation of the New York Mental Hygiene Law §9.39.

209.     Defendant NYCHH was acting under color of state law.

WHEREFORE, Plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.

## COUNT 6 – WOODHULL - 42 U.S.C. §1983, 14th AMENDMENT

210.     Plaintiff incorporates by reference paragraphs 1 through 209 of the Complaint.

211.     14th Amendment of the Constitution sets forth the following. …No state….shall deprive any person of life, liberty, or property, without due process of law;…

212.     Defendant Woodhull failed to comply with Section §9.39 of the Mental Hygiene Law in that Form OMH 474 (10-08) EMERGENCY ADMISSION §9.39 Mental Hygiene Law, II. Record of Admission B. Circumstances which led to the

person brought to the hospital, fails to denote any circumstances, specific facts regarding the actions taking on behalf of plaintiff that would have justified plaintiff being involuntarily hold by NYCHH because plaintiff's actions were likely to result in serious harm to herself or others.

213.    Defendant Woodhull knew or should have known that its actions violated plaintiff's 14th Amendment due process rights.

214.    Plaintiff was deprived of liberty without due process of law in violation of the fourteenth amendment of the U.S. Constitution.

215.    Defendant Woodhull was acting under color of state law.

WHEREFORE, Plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.

## <u>COUNT 7 – WOODHULL – 42 U.S.C. §1983, 14th AMENDMENT</u>

216.    Plaintiff incorporates by reference paragraphs 1 through 215 of the Complaint.

217.    Defendant Woodhull failed to comply with Section §9.39 (2)(a) of the Mental Hygiene Law in that Form OMH 474 (10-08) EMERGENCY ADMISSION §9.39 (2)(a) Mental Hygiene Law, III. Examination to confirm need for extension of emergency admission beyond forty eight (48) hours E. Does the patient show the tendency to cause serious harm to him/herself or others answering yes failed to explain the determination plaintiff showed the tendency to cause a serious harm to herself or others by denoting danger to self & others,  defendant Woodhull's personnel answering yes, failed to provide an explanation as to plaintiff showing a tendency to cause serious harm to herself or others.

218.    Defendant Woodhull's personnel denoted plaintiff showed a tendency to cause a serious harm to herself or others by writing danger to herself & others.

219.     Defendant Woodhull knew or should have known that its´ employees actions violated plaintiff's rights protected by the New York Mental Hygiene Law §9.39 (2)(a).

220.     Plaintiff was deprived of her civil rights in violation of the New York Mental Hygiene Law §9.39 (2)(a).

221.     Defendant Woodhull was acting under color of state law.

WHEREFORE, Plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.

### COUNT 8 –WOODHULL – 42 U.S.C. §1983, 14th AMENDMENT

222.     Plaintiff incorporates by reference paragraphs 1 through 221 of the Complaint.

223.     Defendant Woodhull failed to comply with Section §9.39 of the Mental Hygiene Law in that Form OMH 474 (10-08) EMERGENCY ADMISSION §9.39 Mental Hygiene Law was violated, application was not completed as required if as in the case of plaintiff, plaintiff was retained beyond fifteen (15) days.

224.     Defendant Woodhull knew or should have known that its´ employees actions violated plaintiff's rights protected by the New York Mental Hygiene Law §9.39.

225.     Plaintiff was deprived of rights in violation of the New York Mental Hygiene Law §9.39.

226.     Defendant Woodhull was acting under color of state law.

WHEREFORE, Plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.

### COUNT 9 – LINN – 14th AMENDMENT – DUE PROCESS

227.     Plaintiff incorporates by reference paragraphs 1 through 226 of the Complaint.

228.     Defendant Linn failed to comply with section §9.39 of the Mental Hygiene Law in that defendant signing form OMH 474 July 2, 2020 affirmed (s)he examined

plaintiff prior to admission and found there was a reasonable cause to believe that plaintiff had a mental illness for which immediate observation, care and treatment in a mental hospital is appropriate and which is likely to result in serious harm to herself or others.

229.    Form OMH 474, circumstances which led the person being brought to the hospital fails to substantiate plaintiff had a mental illness that was likely to result in harm to herself or others in that no language sets forth plaintiff made threats or attempts to commit suicide or cause herself serious bodily harm or that plaintiff by her conduct demonstrated that she was dangerous to herself or others.

230.    Defendant Linn was acting under color of state law.

WHEREFORE, Plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.

## COUNT 10 – PATTERSON – 14th AMENDMENT – DUE PROCESS

231.    Plaintiff incorporates by reference paragraphs 1 through 230 of the Complaint.

232.    Defendant Patterson failed to comply with section §9.39 (2)(a) of the Mental Hygiene Law in that Form OMH 474 (10-08) EMERGENCY ADMISSION §9.39 (2)(a) Mental Hygiene Law, III. Examination to confirm need for extension of emergency admission beyond forty eight (48) hours E. Does the patient show the tendency to cause serious harm to him/herself or others, answering yes, failed to provide any explanation or basis for determining plaintiff showed a tendency to cause a serious harm to herself or others.

233.    Defendant Patterson knew or should have known that its actions violated plaintiff's rights protected by the New York Mental Hygiene Law §9.39 (2)(a).

234.    Plaintiff was deprived of rights in violation of the New York Mental Hygiene Law §9.39 (2)(a).

235.     Defendant Patterson was acting under color of state law.

WHEREFORE, Plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest and attorney fees.

## COUNT 11 – CITY OF NEW YORK – NYS CONSTITUTION ARTICLE 1 §12

236.     Plaintiff incorporates by reference paragraphs 1 through 235 of the Complaint.

237.     Defendant Robinson forcibly broke into plaintiff´s home without a warrant and without the consent of plaintiff.

238.     Defendant Robinson, by his acts violated plaintiff´s right against unreasonable searches and seizures under the Article 1 §12 of the NYS Constitution.

239.     Defendant Robinson was acting under color of state law.

240.     Defendant Robinson knew, or a reasonable officer acting in defendant Robinson´s position would have known that his actions violated the NYS Constitution Article 1 §12.

241.     Defendant Robinson´s invasion of plaintiff´s privacy caused plaintiff to suffer extreme emotional distress and humiliation and monetary damages.

WHEREFORE, plaintiff prays for a judgment in excess of seventy-five thousand dollars, together with costs, interest, exemplary damages and attorney fees.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury on all questions of fact raised by the complaint.

**WHEREFORE**, Plaintiff prays for a judgment in excess of one million dollars, together with costs, interest and attorneys fees.

Respectfully Submitted,

Dated: April 8, 2022

By: _____

STEVE NEWMAN (SN8351)
LAW OFFICES OF STEVE NEWMAN
Attorney for Plaintiff
*SHAUNDA PHILLIP*
65 Broadway, Suite 1603
New York, New York 10006
Tel: (212) 405-1000
newmanesquire@aol.com