UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHAUNDA PHILLIP,

                    Plaintiff,

          – against –

CITY OF NEW YORK, NYC HEALTH
AND HOSPITALS CORPORATION,
NYC HEALTH AND HOSPITALS
CORPORATION/WOODHULL
MEDICAL CENTER, HTET HTET LINN,
M.D., KIRK PATTERSON, M.D., and
NYPD OFFICER JOHN DOE
ROBINSON,

                    Defendants.

**NOT FOR PUBLICATION**

**MEMORANDUM & ORDER**

21-cv-6599 (ERK)(PK)

KORMAN, *J.*:

On July 2, 2020, the New York City Police Department ("NYPD") received a 911 call from Darlen Usher, requesting that police and emergency services check on the well-being of her daughter, plaintiff Shaunda Phillip.  Usher told 911 that her daughter had not taken her prescribed medications for bipolar disorder for eight months and was hallucinating.  When police officers and emergency personnel arrived at Phillip's apartment, she refused them entry for over an hour.  Law enforcement eventually forced Phillip's door open, handcuffed her, and brought her downstairs for an evaluation by emergency services.  Following the evaluation, Phillip was transported to Woodhull Medical Center, where she was involuntarily

committed under New York's Mental Hygiene Law ("NY MHL") until August 10, 2020.

Phillip brought suit alleging her constitutional rights were violated by, *inter alia*, the warrantless entry into her apartment by the City of New York and its agents, and by her involuntary commitment and treatment by New York City Health and Hospitals Corporation and two of its doctors.   Pending before me now are two motions to dismiss.   For the reasons stated below, I **GRANT** the motions to dismiss.

## FACTUAL BACKGROUND

The following facts are drawn from Phillip's First Amended Complaint ("FAC") and documents "integral to, or explicitly referenced in, the pleading," *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002), including plaintiff's medical records from Woodhull Medical Center.[1]

On July 2, 2020, Phillip's mother, Darlen Usher ("Usher") placed a call to 911 requesting a wellness check for her daughter.   FAC ¶ 17.   Usher informed the 911 operator that Phillip was experiencing hallucinations and had not taken her

---

[1] Ordinarily, a court cannot look beyond "the four corners of the complaint" when considering a motion to dismiss.  *Mayo v. Fed. Gov't*, 558 Fed. App'x 55, 56 (2d Cir. 2014) (citing *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000)).   Nevertheless, the court may examine and rely on documents plaintiff relied upon in drafting the complaint, even where the documents were not appended to the complaint.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006); *Spencer v. Bellevue Hosp.*, 2012 WL 1267886, at *1-3 (S.D.N.Y. Apr. 12, 2012) (drawing facts from the plaintiff's medical records, which were "relied heavily upon" in the complaint). Phillip's First Amended Complaint references her medical records throughout.  *See, e.g.,* FAC ¶¶ 128-153, 155-160, 194-96.

prescribed medications for eight months.  *Id.*  New York City Emergency Medical Services ("EMS") personnel responded, along with NYPD officers.  *Id.* at ¶ 18.  EMS requested that Phillip open her apartment door, but she refused.  *Id.* at ¶¶ 21-22.  EMS informed Phillip that they were responding to a call from her mother, which Phillip confirmed by calling Usher.  *Id.* at ¶¶ 25-27.  Phillip then informed EMS and NYPD that she "was feeling well" and did not need assistance, and requested that they leave.  *Id.* at ¶¶ 28, 33.  EMS and NYPD refused to leave without performing a wellness check.  *Id.* at ¶ 37.

Phillip alleges that, after twenty minutes of knocking on Phillip's door, EMS and NYPD cut a hole in her apartment door and placed two surveillance robots in her apartment via the hole to observe her.  *Id.* at ¶¶ 40-51.  Phillip placed both surveillance items into a bucket to prevent observation.  *Id.* at ¶¶ 48, 51.  Phillip still refused to leave her apartment for over an hour while EMS and NYPD officers continued to call her name and request that she speak to them.  *Id.* at ¶¶ 55-56.  She repeatedly hit her apartment door with a hammer to close the hole created by EMS and NYPD.  *Id.* at ¶ 52.  EMS and NYPD then broke Phillip's door lock and entered her apartment.  *Id.* at ¶ 57.  Upon entering Phillip's apartment, she was handcuffed and escorted to an ambulance so EMS personnel could conduct a wellness and vitals check.  *Id.* at ¶¶ 61-62, 78-79, 83.

Based on EMS's examination, Phillip was transported to Woodhull Medical Center ("Woodhull"), a hospital operated by New York City Health and Hospitals Corporation ("NYCHH").  *Id.* at ¶ 85.  According to her medical records, Phillip arrived at Woodhull at 2:13PM.  ECF No. 37-2 ("Def.'s Ex. B") at 15.  Phillip was first evaluated by Malgorzata Zwonaruk Sopek, R.N. ("Sopek").  *Id.* at 18.  Sopek noted that Phillip was "irritable, angry, demanding, restless but manageable" and denied any hallucinations or suicidal ideation.  *Id.*  Psychiatrist Htet Htet Linn, M.D. ("Dr. Linn") examined Phillip at approximately 3:30PM and found there was reasonable cause to admit Phillip.  *Id.* at 1490.  Phillip was officially admitted at 5:09PM on July 2, 2020 under NY MHL § 9.39's emergency provision.  *Id.* at 15.  She was provided with a "Notice of Status and Rights - Emergency Admission."  *Id.* at 1492.

The next day, July 3, 2020, Phillip was again evaluated by Dr. Linn at 4:56 PM.  *Id.* at 19.  Dr. Linn described Phillip as "hyper talkative, manic, grandiosity delusional, labile, flight of ideas, illogical, boisterous, agitated due to acute psychosis, disorganized in thought process, paranoid, odd/bizzare [*sic*], absent insight of her mental illness."  *Id.* at 20.  A second Woodhull staff physician, Kirk Patterson, M.D. ("Dr. Patterson"), also evaluated Phillip on July 3, 2020.  *Id.* at 1491.  Dr. Patterson confirmed Dr. Linn's impressions of Phillip being manic,

diagnosed Phillip with schizoaffective disorder, and confirmed that Phillip needed to be admitted beyond 48 hours.  *Id.* at 1491.

On July 14, 2020, Camille Mendez-Maldonado, M.D. ("Dr. Mendez-Maldonado"), a physician at Woodhull, submitted an application for involuntary admission of Phillip under NY MHL § 9.27.  *Id.* at 1481-83.  The application stated that Dr. Mendez-Maldonado's reasons for admitting Phillip were a history of bipolar disorder, and that Phillip was "irritable, delusional, [and had] poor sleep." *Id.* at 1481.  The application was also signed by Michel Joseph, M.D., an NYCHH psychiatrist, certifying that Phillip "is in need of involuntary care and treatment" and that "as a result of [her] mental illness," Phillip "poses a substantial threat of harm to self or others."  *Id.*  As required by NY MHL § 9.27, the application was supported by certification of two examining physicians.  *Id.* at 1483-86.  Dr. Mendez-Maldonado stated in her supporting certificate that Phillip presented with acute mania and psychosis.  *Id.* at 1483.  According to Dr. Mendez-Maldonado, Phillip "require[d] admission for safety stabilization."  *Id.*  Emmanuelle Duterte, M.D. ("Dr. Duterte"), also certified that Phillip was "currently manic" with "grandiose delusions."  *Id.* at 1485.  Dr. Duterte further noted that Phillip was "refusing medications" and had "impaired insight."  *Id.*  Again, Phillip was provided with a document informing of her of her status and rights after her "conversion to involuntary status."  *Id.* at 1487.

5

Phillip refused treatment and medication at Woodhull, and an application was made by Woodhull staff requesting authorization for involuntary treatment. *Id.* at 1476.  A hearing on the application was held on July 30, 2020.  *Id.* at 156, 1476-77.  Phillip was represented at this hearing by counsel provided by the Mental Hygiene Legal Service.  *Id.* at 1475.  After reviewing affidavits from Dr. Mendez-Maldonado and Dr. Duterte, hearing testimony from Dr. Mendez-Maldonado, and hearing argument from counsel, Justice Lillian Wan found that Phillip "lack[ed] the mental capacity to make a reasoned decision to refuse treatment," and found that treatment was "in the patient's best interests."  *Id.* at 1477.  Justice Wan thus authorized Woodhull to administer eight psychosis medications to Phillip over her objection.  *Id.* at 1477-78.

Phillip also exercised her right to a hearing on the need for involuntary care and treatment under NY MHL § 9.31.  *Id.* at 1479.  The hearing was held on August 5, 2020, and Phillip was again represented by counsel provided by the Mental Hygiene Legal Service.  *Id.*  After hearing testimony from Dr. Mendez-Maldonado and Phillip, Justice Steven Z. Mostofsky denied Phillip's motion for release.  *Id.*

After receiving medication, Woodhull staff found Phillip was "more organized, cooperative, calmer and compliant with treatment."  *Id.* at 156-7.  Her

treatment team deemed her stable enough for discharge. *Id.* at 157. Phillip was discharged from Woodhull on August 10, 2020. *Id.* at 25.

Phillip filed this lawsuit on November 24, 2021. ECF No. 1. An amended complaint was filed on April 8, 2022. On July 22, 2022, NYCHH, Dr. Linn, and Dr. Patterson (together, the "NYCHH Defendants") moved to dismiss all claims against them. ECF No. 36. On September 30, 2022, the City of New York moved to dismiss all claims against it and its agents. ECF No. 58.

## **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must plead sufficient facts that, when taken as true, "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When deciding a motion to dismiss, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

## **DISCUSSION**

Phillip's claims arise from the warrantless entry in her home (Counts I, II, and XI against the City of New York and its agents) and her involuntary commitment under New York's Mental Hygiene Law (Counts III, IV, V, VI, VII, VIII, IX, and X, against NYCHH, Woodhull Medical Center, Dr. Linn, and Dr. Patterson). I will address these claims separately.

## I.      Claims Against the City of New York

Phillip brings three claims against the City of New York: a § 1983 claim for unlawful entry, a municipal liability claim, and a claim for violation of the New York State Constitution.  FAC at ¶¶ 166-83; 236-41.

### A. Unlawful Entry

As an initial matter, even assuming plaintiff could state a claim against "NYPD Officer John Doe Robinson" or any City employee under Section 1983 for unlawful entry, the same claim brought directly against the City must fail because "municipal governments . . . may be sued only for unconstitutional or illegal policies, not for the illegal acts of their employees."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Santos v. New York City*, 847 F. Supp. 2d 573, 577 (S.D.N.Y. 2012) (New York City, "as a municipality, cannot be held vicariously liable for the constitutional torts of its employees.").  Therefore, Count I against the City of New York is **DISMISSED.**

The FAC also alleges suit against NYPD Officer John Doe Robinson "in his individual and official capacity."  FAC at ¶ 11.  Nevertheless, the FAC does not actually contain any claims against NYPD Officer John Doe Robinson, instead bringing all claims arising from the warrantless entry only against the City of New York.  *See* FAC at ¶¶ 166-79, 236-41.  The City of New York's motion to dismiss and accompanying memoranda diligently analyze Phillip's § 1983 claim

regardless.  *See* Mem. of Law in Supp. of Def. City of New York's Mot. to Dismiss, ECF No. 59, ("City of New York Mem.") at 7-10.  Nevertheless, there is no evidence on the docket that NYPD Officer John Doe Robinson was ever identified or served with a summons and a copy of the Complaint; Phillip has not amended her Complaint to identify NYPD Officer John Doe Robinson by name; nor does NYPD Officer John Doe Robinson join the City of New York's motion to dismiss.

To the extent that Phillip's § 1983 claim may be construed as a claim against NYPD Officer John Doe Robinson, such claim is **DISMISSED** without prejudice, pursuant to Federal Rule of Civil Procedure 4(m), provided that within twenty days of the date of this Order, Phillip may, for good cause shown, request that the action as to NYPD Officer John Doe Robinson be reinstated.  *See Santos*, 847 F.Supp.2d at 577-78.

### B. Municipal Liability

Phillip also alleges that defendant City of New York "developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of persons in Kings County," and that the City is liable for

these policies and customs under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978). FAC at ¶¶ 180-83 (Count II).

Under *Monell*, municipalities are not liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." 436 U.S. at 691. Assuming, *arguendo*, that the warrantless entry into Phillip's apartment did violate the Constitution, the City of New York is liable under § 1983 only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is conducted "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690-91.

Phillip alleges that the City of New York "developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of persons," including "inadequately train[ing] and supervis[ing] their police officers," and "not requir[ing] appropriate in-service training or retraining of officers who were known to have engaged in police misconduct." FAC at ¶¶ 181-82. As evidence for these policies, Phillip states that "[i]f the NYPD officers were properly trained[,] the NYPD officers would have recognized that plaintiff would have had to exhibit behavior justifying the invoking of the Emergency Aid Doctrine" and "[i]f the NYPD officers had been properly trained[,] they would

have concluded that noncompliance in ingesting prescribed medicine did not constitute behavior that could cause serious harm to plaintiff or others or require the intervention of NYPD officers to prevent plaintiff from injuring herself." *Id.* at ¶¶ 182, 184.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A municipality will be found liable "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Anthony v. City of New York*, 339 F.3d 129, 140 (2d Cir. 2003) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989)).

To successfully allege deliberate indifference in the context of a failure to train claim, a plaintiff must plead facts that show: "(1) the municipality knows 'to a moral certainty' that its employees will confront a given situation, (2) either the situation presents the employees with a difficult choice of the sort that training will make less difficult, or there is a history of employees mishandling the situation, and (3) the wrong choice by the employee will frequently cause a constitutional deprivation." *Aquino v. City of New York*, 2017 WL 384354, at *5 (S.D.N.Y. Jan. 25, 2017) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not 'suffice if it tenders

naked assertion[s] devoid of further factual enhancement." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 301-02 (S.D.N.Y. 2015). "To survive a motion to dismiss a municipal liability claim, a plaintiff must allege facts tending to support, at least circumstantially, an inference that . . . a municipal policy or custom exists." *McLennon v. City of New York*, 171 F. Supp. 3d 69, 95 (E.D.N.Y. 2016) (quoting *Santos*, 847 F. Supp. 2d at 576) (internal quotation marks omitted).

Phillip's *Monell* claim against the City of New York for failure to train its officers cannot withstand a Rule 12(b)(6) motion to dismiss. Phillip does not plead any facts that suggest that the City of New York failed to train or supervise NYPD officers with respect to mental health wellness checks. Nor does Phillip plead any facts tending to show that the alleged failure to train amounted to deliberate indifference to the constitutional rights of individuals in Phillip's position. "Because the existence of a municipal policy or practice, such as a failure to train . . ., cannot be grounded solely on the conclusory assertions of the plaintiff," *Santos*, 847 F. Supp. 2d at 577, Count II against the City of New York is **DISMISSED** with prejudice.

### C. New York State Constitution

Having dismissed Plaintiff's federal claims against the City of New York, the Court declines, in its discretion, to retain supplemental jurisdiction over the state constitutional claim enumerated in the Complaint. *See* 28 U.S.C. § 1367(c)(3);

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine … will point toward declining to exercise jurisdiction over the remaining state-law claims."). At this early stage of litigation, with all federal claims against the City of New York dismissed prior to discovery, the "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350).

Accordingly, Count XI is **DISMISSED** without prejudice.

## II. NYCHH Defendants

### A. Defendant Woodhull Medical Center

First, Phillips raises three claims against Woodhull Medical Center ("Woodhull"), the hospital where she was involuntarily committed. FAC at ¶¶ 210-226. Since Woodhull is "a facility owned and operated by [New York City Health and Hospitals Corporation], it is not a suable entity and may not be sued independently." *Bonnen v. Coney Island Hosp.*, 2017 WL 4325703, *5 (E.D.N.Y. Sept. 6, 2017); *Ayala v. Bellevue Hosp.*, 1999 WL 637235, at *3 (S.D.N.Y. Aug. 20, 1999) (citing N.Y. Unconsol. Laws § 7385(1) (McKinney 1979)).

Accordingly, Counts VI, VII, and VIII against defendant Woodhull Medical

Center are **DISMISSED**.

### B. NYCHH Defendants

"A § 1983 claim arising from involuntary civil commitment may be

analyzed under the Fourteenth Amendment's Due Process Clause or the Fourth

Amendment's prohibition of unreasonable seizures." *Eze v. City Univ. of New York*

*at Brooklyn Coll.*, 2011 WL 6780652, at *3 (E.D.N.Y. Dec. 27, 2011) (citations

omitted).  Phillip styles her claims against the NYCHH Defendants as due process

claims under the Fourteenth Amendment. *See, e.g.,* FAC at ¶¶ 185-88.

Involuntary commitment to a mental hospital is "a massive curtailment of

liberty" and "requires due process protection." *Vitek v. Jones*, 445 U.S. 480, 491-

92 (1980) (internal quotation marks and citations omitted).  Due process does not

allow the involuntary commitment of a person who is not mentally ill *and* a danger

to himself or others.  *See Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d

Cir. 1995); *O'Connor v. Donaldson*, 422 U.S. 563, 575-76 (1975) ("[T]here is still

no constitutional basis for confining [mentally ill] persons involuntarily if they are

dangerous to no one and can live safely in freedom.").

The New York Mental Hygiene Law, the statutory scheme for civil

commitment in New York state, has been found to "facially satisf[y] Fourteenth

Amendment due process requirements." *Olivier v. Robert L. Yeager Mental Health*

*Ctr.*, 398 F.3d 183, 188 (2d Cir. 2005) (citing *Project Release v. Prevost*, 722 F.2d 960, 972-74 (2d Cir. 1983)).  If the defendants complied with "the procedural requirements of the relevant statutory section, the demands of substantive and procedural due process have been met and no claim under 42 U.S.C. § 1983 has been stated." *Jelich v. Hogan*, 2009 WL 3497495, at *2 (E.D.N.Y. Oct. 27, 2009). Phillip challenges her commitment under NY MHL §§ 9.39 and 9.27. FAC at ¶¶ 162, 164, 186, 200, 206, 228, 232.

### I. Emergency Admission Under NY MHL § 9.39

M.H.L. § 9.39(a) provides for the emergency admission of a person "only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section."  The person must be "alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate," *and* that the person's mental illness is "likely to result in serious harm to himself or others."  M.H.L. § 9.39(a); *Rodriguez*, 72 F.3d at 1062.  Further, the patient may not be held for longer than 48 hours unless the findings of the staff physician are "confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital." M.H.L. § 9.39(a).  The statute defines likelihood to result in serious harm as a "substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is

15

dangerous to himself," or a "substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."  M.H.L. § 9.39(a)(1), (2).

The Second Circuit interprets § 9.39 as "implicitly defer[ring] to medical judgment." *Rodriguez*, 72 F.3d at 1062-63.  The statute therefore requires "a physician to make a medical decision, guided by standards that are generally accepted within the medical community." *Id.* at 1063.

Phillip's medical records indicate that she was admitted to Woodhull Medical Center at 5:09PM on July 2, 2020.  Def. Ex. B at 15.  Dr. Linn examined Phillip at 3:30PM and, based on that examination, ordered her admitted.  *Id.* at 1490.  The next day, July 3, 2020, at 12:00PM, Dr. Patterson conducted an examination to confirm the need for extension of emergency admission beyond 48 hours, noting on the § 9.39 emergency admission application that Phillip was "manic" and diagnosing her with schizoaffective disorder.  *Id.* at 1491.  Dr. Patterson also found that Phillip was a "danger to self [and] others."  *Id.*

Phillip argues that the NYCHH Defendants did not comply with the procedural requirements of M.H.L. § 9.39 for two reasons: (1) because Dr. Linn did not examine Phillip before she was admitted to Woodhull; and (2) because Dr. Patterson "failed to explain how plaintiff showed a tendency to cause a serious harm to herself or others."  ECF No. 42 ("Pl. Opp.") at 7.  Both assertions are

16

contradicted by the medical records, incorporated into, and relied upon, in Phillip's
Complaint.

The application for emergency admission under § 9.39 reflects that Dr. Linn
examined Phillip at 3:30PM on July 2, 2020, almost two hours before she was
admitted at 5:09PM. Def. Ex. B at 1490. Phillip argues that Dr. Linn could not
have examined her at 3:30PM, because, in a note timestamped 3:32PM, Nurse
Sopek stated that Phillip was waiting to be seen by a psychiatrist. Pl. Opp. at 12;
Def. Ex. B at 18. But the time of Nurse Sopek's note does not necessarily
correspond exactly to the time of the examination—common sense supports the
notion that notes may be entered minutes or hours after examinations occur.
Indeed, as pointed out by NYCHH Defendants, Nurse Sopek signed and dated
another form for Phillip at 3:00PM on July 2, 2020, indicating that her examination
likely occurred closer to 3:00PM. ECF No. 47 ("Reply Br.") at 5; Def. Ex. B at
1496. Dr. Linn examining Phillip at 3:30PM, therefore, is entirely possible.
Further, a psychiatric emergency services assessment completed by a Nurse
Practitioner on July 2, 2020, notes "Case and Disposition discussed with Attending
Linn." Def. Ex. B at 147. The record is clear that Dr. Linn did, indeed, examine
Phillip on July 2, 2020, prior to her admission.

The medical records also reflect that Dr. Patterson examined Phillip on July
3, 2020 and confirmed Dr. Linn's findings within 48 hours of admission, as

required by NY MHL § 9.39.  Phillip argues that Patterson failed to explain how she was a danger to herself or others.  Pl. Opp at 32-33.  But Dr. Patterson's examination and signature "confirm[ing] that there is reasonable cause to believe that the patient has a mental illness for with immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm" to herself or others satisfies the procedural demands of NY MHL § 9.39.  Def. Ex. B at 1491. Moreover, there is evidence elsewhere in Phillip's medical files that support the finding that she was a danger to herself or others.  *See, e.g.,* Def. Ex. B at 122 (describing Phillip as "paranoid" and "verbally threatening" on July 3); 124 (noting an incident where Phillip "verbally and physically threaten[ed]" another patient "without any provocations on July 7); 126 (documenting Phillip "threatening" another patient and staff, "screaming, cursing, and . . . banging and throwing things on the floor"); 130-31 (noting that Phillip was "actively psychotic" and paranoid, and had left a bowl of feces on the bed of another patient she claimed tried to kill her); 147 (noting that, during her initial psychiatric assessment, Phillip was "agitated" with a Broset score[2] "above 2").

---

[2] The Brøset Violence Checklist is "a short-term violence prediction instrument" for "predicting inpatient violence" within the next 24 hour period. A Broset score of 2 indicates "the risk of violence is moderate and preventive measures should be taken."  Phil Woods & R. Almvik, *The Brøset violence checklist (BVC)*, 106 ACTA PSYCHIATRICA SCANDINAVICA 412 (2002).

The NYCHH Defendants satisfied the procedural demands of M.H.L. §
9.39(a) by (1) examining Phillip before her admission to the hospital, and (2)
having another psychiatrist confirm the need for extension of emergency admission
within 48 hours of Phillip's admission.  Therefore, Phillip's emergency admission
did not violate her right to due process.  *Jelich*, 2009 WL 3497495 at *2.

## II. Involuntary Commitment Under NY MHL § 9.27

An individual admitted under the emergency provision of M.H.L. § 9.39(a)
may only be admitted for up to fifteen days.  After fifteen days, upon an
application accompanied by certification from two examining physicians, the
individual may be admitted for longer.  M.H.L. § 9.27(a).

On July 14, 2020, twelve days after Phillips' initial admission to Woodhull,
Dr. Mendez-Maldonado filed an application for involuntary admission under §
9.27, noting that Phillip was "irritable [and] delusional."  Def. Ex. B at 1481.  The
application was accompanied by certifications from Dr. Mendez-Maldonado and
Dr. Emmanuelle Duterte, an attending psychiatrist at Woodhull.  *Id.* at 1483-85.
Dr. Mendez-Maldonado characterized Phillip as presenting with "acute mania
[and] psychosis," and "requir[ing] admission for safety stabilization."  *Id.* at 1483.
Similarly, Dr. Duterte noted that Phillip was "currently manic" with "grandiose
delusions."  *Id.* at 1485.

Phillip argues that her involuntary admission under § 9.27 was improper because she was never examined by Dr. Duterte.  Pl. Opp. at 34-35.  As support for this allegation, Phillip states that her medical records contain no electronic note of this examination.  *Id.*  This allegation is implausible.  In her certificate supporting the application for Phillip's involuntary admission, Dr. Duterte certified that she "with care and diligence personally examined" Phillip on July 15, 2020.  Def. Ex. B at 1485. The application was also submitted "under penalty of perjury."  *Id.* at 1481.

Furthermore, Phillip exercised her right to a hearing under M.H.L. § 9.39 challenging her involuntary commitment under § 9.27.  *Id.* at 1475.  A hearing was held on July 16, 2020, and Justice Steven Mostofsky of the Kings County Supreme Court reviewed the application and its supporting certificates, in addition to hearing testimony from Dr. Mendez-Maldonado and Phillip herself.  *Id.*  Justice Mostofsky ordered that Phillip's "application for release is denied," and that Phillip would "be retained subject to [NY] MHL [§] 9.27."  *Id.*  Such an order necessarily means that the court was satisfied that the NYCHH Defendants complied with the procedural requirements of § 9.27, and thus did not violate due process.

Indeed, the Second Circuit focused on the Mental Hygiene Law's "elaborate notice and hearing provisions, including notice to relatives and others designated by the patient, and the availability of a judicial hearing within five days of demand

by the patient, relative, or friend," in determining that the statutory scheme facially satisfies procedural due process requirements.  *Project Release*, 722 F.2d at 975. Here, "the availability of hearings, counsel and periodic status review," *id.*, supports finding that the NYCHH Defendants complied with § 9.27.

Accordingly, because Phillip has failed to state any plausible claim for relief against the NYCHH Defendants, Counts III, IV, V, IX, and X are **DISMISSED.**

<u>**CONCLUSION**</u>

For all the reasons stated above, Phillip's complaint is **DISMISSED**.

**SO ORDERED.**

<u>*Edward R. Korman*</u>
Brooklyn, New York                                  Edward R. Korman
August 7, 2023                                          United States District Judge